Filed 8/22/14  In re G.A. CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re G.A., et. al, Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>V.A.,<br><br>    Defendant and Appellant. | G049735<br><br>(Super. Ct. Nos. DP014979 & DP019655)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Gary G. Bischoff, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

V.A. (Mother) appeals from the order made at the Welfare and Institutions Code section 366.26 hearing (hereafter the .26 hearing)[1] terminating her parental rights to her daughters G.A. and J.A. She contends the trial court should have applied the "parental benefit exception" to adoption. (§ 366.26, subd. (c)(1)(B)(i).) We find no error and affirm the order.

FACTS AND PROCEDURE

*Prior Dependency Proceedings*

In March 2007, then seven-month-old G.A. and her 11-year-old half-brother (Brother), were declared dependent children due to Mother's long standing and unresolved substance abuse dating back to her teenage years, leaving the two children alone without supervision, and unresolved anger management problems evidenced by assaults on family members. Mother had previously given the maternal grandmother legal guardianship of Brother, but the maternal grandmother had permitted Mother to reside in the home and be Brother's sole caretaker. G.A. and Brother were placed with the maternal grandmother. Brother reunified with the maternal grandmother and his case was closed. Mother received reunification services as to G.A.

J.A. was born in December 2007. At first, Mother and J.A. lived with J.A.'s father,[2] and J.A.'s paternal grandmother and her husband (hereafter sometimes the paternal grandparents). J.A.'s father also had an extensive criminal history and substance abuse problems. There were some reports G.A. lived with them sometimes too, but eventually Mother and J.A. moved in with the maternal grandmother. Mother completed her case plan and reunified with G.A., and the case was terminated in June 2009. But Mother relapsed into substance abuse within a few months.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     G.A.'s father's whereabouts were unknown. J.A.'s father participated in the dependency proceedings and received services, but he is not a party to this appeal. Accordingly, we discuss only the facts pertaining to Mother.

*Current Dependency Proceeding*

*Initial Detention*

The current dependency proceeding was filed in April 2010. G.A. and J.A. were detained when Mother was arrested and incarcerated for driving under the influence and possessing a controlled substance. Mother admitted she had been using methamphetamine for 20 years with some periods of sobriety. The girls were placed with the maternal grandmother where Brother lived. The maternal grandmother explained the girls lived in her home for most of their lives. Mother was in and out of the home because the maternal grandmother would kick her out whenever she relapsed. The maternal grandmother signed an agreement with Orange County Social Services Agency (SSA) that she would not allow Mother into the home for any reason. The court ordered two-hour, twice-weekly monitored visits once Mother was released from jail.

*Jurisdiction & Disposition Hearings*

In July 2010, the court sustained the petition under section 300, subdivisions (b) [failure to protect], (g) [no provision for support], and (j) [abuse of sibling], based on allegations of Mother's substance abuse problem, drug-related criminal history, and the previous dependency history related to her drug use. At the August 2010 disposition hearing, the children were removed from parental custody, and the court vested custody with SSA. Mother and J.A.'s father were given reunification services. Mother's case plan included requirements she remain sober, not break the law, and participate in substance abuse testing and treatment, counseling, and a 12-step program. The court further ordered her to reside in a sober living home, participate in anger management and parenting courses, and be assessed for any medication needs in a therapeutic setting. Mother was given twice-weekly monitored visitation with the girls.

*Re-Detention/Change in Placement*

In October 2010, G.A. and J.A. were removed from the maternal grandmother's home and detained. The maternal grandmother was hospitalized after

3

having a mild stroke and allowed Mother to care for the girls in her home, despite having agreed with SSA to keep Mother away and all visitation would be arranged outside her home as directed by SSA. On November 4, 2010, the girls were placed with the paternal grandmother, and were well cared for by her. Mother objected to the placement and filed a section 388 petition, which SSA opposed. (The section 388 petition was ultimately decided at the six-month review as described below.)

*Six-Month Review Reporting Period*

In its January 31, 2011, report for the six-month review, SSA reported Mother was in a sober living home, unemployed, and on three years formal probation. The children were doing well in their placement with the paternal grandmother. Mother had made moderate progress with her case plan. She seemed to be doing well staying sober and participating in a number of services, including counseling, parenting classes, anger management classes, drug testing and treatment, and a 12-step program. She was having visits with the girls (six hours monitored every week) and no problems were noted.

At the six-month review hearing on March 1, 2011, the court granted Mother's section 388 petition and ordered the girls be transitioned back to the maternal grandmother, beginning with overnight weekends. Mother was given further services. A progress review was set for May 2011 and a 12-month review for July 2011.

*12-Month Review Reporting Period*

In its report for the May 2011 progress review, SSA reported Mother continued to participate in services, but she "continues to be an angry young woman." She was enrolled in a drug treatment program and consistently drug tested. She was consistent with monitored visitation. The children had been transitioned back to the maternal grandmother's home, with the paternal grandmother having visitation. Mother's visitation was liberalized to 10 hours a week monitored by the maternal grandmother in the maternal grandmother's home. Mother and the maternal grandmother signed a

4

visitation contract stating Mother was not to be at the family home at any time outside of the prearranged visitation schedule. On May 2, 2011, Mother was authorized 10 hours per week of unmonitored visitation.

On June 24, 2011, SSA reported Mother was still progressing with services, the children enjoyed spending time with her and wanted to be with her more. Mother's therapist recognized Mother loved her children very much. Mother still had not overcome her anger management issues. In March 2011, Mother pleaded guilty to disturbing the peace and fighting and was placed on 18 months formal probation. On May 29, 2011, she had an altercation with a resident in her sober living home and was evicted as a result. The house manager reported Mother had altercations with other residents and was confrontational and demanding. The social worker noted that in meetings with the social worker and paternal grandmother about visitation with J.A., Mother became hostile and angry if she did not get her way. Mother's probation officer reported Mother had been kicked out of several sober living facilities due to her serious issues with anger.

On June 27, 2011, SSA reported both G.A. and J.A. had temper tantrums but otherwise were developing normally. At visits, the social worker observed Mother sometimes was successful in redirecting the children and exhibiting self-control and patience dealing with their misbehavior. But Mother refused to participate in further anger management classes. Mother's visitation was restricted to supervised, six hours per week, but later liberalized to 10 hours per week unmonitored. For most of this period, visits went well. At the 12-month review on August 4, 2011, the court continued jurisdiction and set an 18-month review hearing for October 2011.

*18-Month Review Reporting Period*

By August, things deteriorated. In early August 2011, Mother was having a visit with the girls at the maternal grandmother's home. She lost her temper with Brother (now 15 years old) and kicked him full force in the ribs. The maternal grandmother took

5

Brother to the hospital but did not report the kicking incident to the social worker, instead describing Mother's visits as "'excellent.'" But the maternal grandmother also said the household dynamics were not good and she did not want to monitor Mother's visits anymore. G.A. said the kicking incident, which she witnessed, made her feel "'scared' and 'sad.'" J.A. said she wanted to go back to living with the paternal grandmother.

SSA restricted Mother's visitation to being professionally supervised. Mother became angry and began making numerous and inconsistent demands as to when the visits could take place. She did not show up for some visits.

Later in August 2011, Mother left her latest sober living home after yelling at roommates and making them feel threatened. She moved into a motel with her boyfriend, Greg M., who had a history of methamphetamine and alcohol abuse and who was recently released from jail. Mother's therapist thought Mother might have Intermittent Explosive Disorder or Oppositional Defiant Disorder, and reported they were continuing to work on anger issues, but Mother was unwilling to admit she had an anger management problem. By September 2011, Mother was terminated from therapy after three no shows and terminated from outpatient drug treatment for failure to participate. She did not follow through on her referral to anger management class. She did resume drug testing and had two negative tests. At the October 2011, 18-month review hearing, the court terminated reunification services and set a .26 hearing to determine the children's permanent plan.

*The October 2011 .26 Hearing*

In its February 2012 reports for the .26 hearing, SSA reported the girls continued to be placed with the maternal grandmother and were generally doing well. Mother was having weekly supervised visits with the girls that usually went well, but Mother also went several months without visiting. She typically complained she wanted different monitors and she could not find time to get to the visitation facility. At the visits she attended, the girls often had difficulty listening to Mother and displayed

disruptive or aggressive behavior, e.g. becoming very angry and kicking or hitting or biting Mother, or screaming at high volumes for a long time. Mother occasionally left visits early because of G.A.'s reaction to her. The maternal grandmother preferred to not adopt the girls, requesting legal guardianship. SSA recommended the court find the girls were living with a relative who was unwilling to adopt but capable of providing them with a permanent home and removal from that relative would be detrimental to their well being.

A .26 hearing took place in March 2012. The court ordered a permanent plan of legal guardianship with the maternal grandmother as guardian. It found the provisions of section 366.26, subdivision (c)(1)(A) [relative caretaker unable to adopt] and/or (c)(1)(B)(iv) [foster parent caretaker unable to adopt] applied and adoption and termination of parental rights was not in the children's best interests.[3] The court

---

[3] Mother and SSA both state in their briefs that at this first .26 hearing the court also applied the section 366.26, subdivision (c)(1)(B)(vi), parental benefit exception to termination of parental rights. That assertion is based on the reporter's transcript from the March 28, 2012, hearing, which states the court was making findings under section 366.26, subdivision (c)(1)(A), and/or (c)(1)(B)(iv) [relative caretaker] *and* (vi) [parental benefit]. But there was no testimony presented at the hearing, and nothing in the record suggests Mother raised the parental benefit exception to termination of parental rights at the first .26 hearing. The SSA reports introduced into evidence referred only to the relative caretaker exception. The minute order makes no mention of the parental benefit exception and states the court's findings were made only under section 366.26, subdivision (c)(1)(A) [relative caretaker unable to adopt] and/or (c)(1)(B)(iv) [foster parent caretaker unable to adopt]. Moreover, the minute order states the court's order and findings at the first .26 hearing were made pursuant to a signed stipulation. The signed stipulation refers only to the relative caretaker exception. There was no stipulation to findings the parental benefit exception applied. Our Supreme Court has held that when the reporter's transcript of the court's oral pronouncement and the clerk's transcript are in conflict, the inconsistency need not always be resolved in favor of the reporter's transcript. (*People v. Smith* (1983) 33 Cal.3d 596, 599.) The Court explained that where the trial court's oral ruling and the minutes reflecting the ruling cannot be harmonized, it may be proper that "'that part of the record will prevail, which, because of its origin and nature or otherwise, is entitled to greater credence [citation]. Therefore whether the recitals in the clerk's minutes should prevail as against contrary statements in the reporter's transcript, must depend upon the circumstances of each

7

authorized Mother to have up to eight hours of visitation per week, not in the home, with four to six hours monitored by the maternal uncle and the rest monitored by SSA.

*Periodic Reviews of Guardianship with Maternal Grandmother*

In its report for the April 30, 2012, interim review hearing, SSA explained both the maternal grandmother and maternal uncle felt Mother's visits needed to be supervised and Mother should not be left alone with them due to her explosive behavior. The girls were happy and healthy in the maternal grandmother's care. Mother requested additional visitation time, which the court denied. The court ordered the girls were to have no contact with Mother's boyfriend, Greg M.

However, there was evidence the girls were having unauthorized contact with Mother and her boyfriend including sometimes in her apartment and/or overnight. G.A. described seeing Mother and her boyfriend, Greg M., fighting with "bad words" at their residence, which scared her. Mother, the maternal grandmother, and the maternal uncle denied there was any unauthorized contact with Greg M. Mother's visitation time and monitor status fluctuated during this period. In July 2012, Mother's visitation was suspended. In August 2012, it was reinstated and the court ordered all visitation monitored by a professional monitor and arranged through SSA and ordered the social worker to make weekly unannounced visits to the maternal grandmother's home.

On September 10, 2012, SSA reported Mother had expressed no willingness to comply with being consistently available for visitation with the girls. G.A. continued to comment on seeing Mother and Greg M. outside of the monitored visits, but J.A. said she had not seen Mother in a long time. The social worker had to admonish the maternal grandmother to not spank the girls as punishment—something they had

particular case.' [Citations.]" (*Ibid*.) Here, the circumstances—including the minute order, the signed stipulation, and the lack of any evidence or argument concerning the parental benefit exception—plainly indicate the court applied only the relative caretaker exception at the March 28, 2012, .26 hearing.

discussed on other occasions and the maternal grandmother had previously agreed not to do.

On September 24, 2012, SSA reported the maternal grandmother had again allowed unauthorized contact with Mother. Brother had moved from the maternal grandmother's home to a military style "boot camp" due to his "'out of control'" behavior. As of September 11, 2012, Mother had not participated in any of her scheduled visits. She denied knowing about any scheduled visits and continued to assert she could not commit to regular scheduled visit times because of her work schedule. The social worker observed Mother was unwilling to accept the court's or SSA's terms of supervised visitation.

On December 17, 2012, SSA reported Mother failed to show up for visits on November 6 and November 18. She called and canceled 15 minutes later for one of the visits and did not call at all as to the other. At a supervised visit on December 2, 2012, Mother attempted to get now six-year-old G.A. to stop marking on Mother with a marking pen, and G.A. physically attacked Mother, hitting, kicking, pinching, and screaming, requiring staff intervention.

In March 2013, SSA reported the children continued to live with the maternal grandmother. She provided them with their basic needs, and they were happy living there. But the maternal grandmother was not consistent with keeping SSA informed about the children's whereabouts. Mother attended the supervised visits with the children but continued to be inconsistent. She occasionally left early when she became frustrated with the children. The supervised visitation sometimes went well, with playing, affection, and appropriate redirection by Mother. But sometimes the girls had difficulty listening to Mother and became disruptive and/or attacked her, making her frustrated. Mother sometimes acted inappropriately during visits. For example, at one visit she dragged J.A. on the ground after J.A. punched Mother. Mother was sometimes combative and used profanity in front of the children.

9

*SSA's Section 387 Petition/Section 388 Motion*

In April 2013, G.A. and J.A. described more unauthorized contact with Mother and Greg M., including overnights at Mother's and the maternal grandmother's homes. G.A. described close physical contact with Greg M. during these visits— sometimes she slept in the same bed with him and Mother and once he held her upside down and shook her around. Mother, the maternal grandmother, and the maternal uncle denied what the girls described. J.A. told the social worker the maternal grandmother was mean to her and spanked her and she wanted to live with the paternal grandmother— "that is my dream come true." G.A. told the social worker visits with Mother were "'pretty bad.'" She said the maternal uncle was "mean to her, spanks her and yells at her." She said the maternal grandmother and maternal uncle argued all the time.

Brother denied G.A. and J.A. were home when Mother came over. He told the social worker Mother and Greg M. were married, and they had a very volatile and violent relationship. He said Mother had serious anger management problems and Greg M. drank a lot. Brother understood they had been evicted from three apartments due to their violent behavior. Brother said Mother acted like she was still using drugs. He said Mother and Greg M.'s home was "'beyond terrible'" and felt "[M]other cares more about herself than she does about her children."

In May 2013, SSA filed a supplemental petition for a more restrictive placement. G.A. and J.A. were removed from the maternal grandmother's home and placed with the paternal grandmother. They were happy and excited to go to her home, were doing well there, and she met all their needs. Mother objected to placement with the paternal grandmother. The court authorized Mother to have two-hour visits twice a week. Her section 388 motion to liberalize visits was summarily denied. Mother's formal probation expired in May 2013, and her probation officer reported she had last tested positive in March 2012 for opiates, codeine, and morphine which was usually positive for heroin. SSA recommended no services for Mother or the maternal

10

grandmother. It recommended the permanent plan of guardianship was no longer appropriate, and recommended the court schedule a .26 hearing. The paternal grandmother was willing to adopt both girls. The court ordered monitored visitation for both Mother and maternal grandmother.

In June 2013, Mother was visiting once a week for two hours, and the maternal grandmother was visiting twice a week for five hours total. Mother's visits sometimes went well, with mutual affection and expressions of love, laughing, playing, and appropriate redirection by Mother. Some visits with Mother did not go well, and the girls would act out, disobey Mother, cry, scream, and physically attack her. Mother missed two visits. When she did not show up, G.A. was sad and tearful. At one June visit, Mother was "'out of it'" because the previous night Greg M. hit her on the head so hard she had a concussion, and he was now in jail.

In August 2013, the section 387 supplemental petition was dismissed, when all counsel agreed section 388 was the proper vehicle for addressing the issues it raised. The girls' therapists concluded returning to the maternal grandmother's care would be detrimental. The girls displayed behaviors such as hyperactivity, attention deficit hyperactive disorder (ADHD), defiance, aggressiveness, hitting, not taking responsibility, and lack of remorse. The therapists believed the negative behavior was not because of a change in their placement but due to being traumatized and neglected in an environment with no structure or boundaries or consequences. Both girls had difficulty adjusting to a more structured environment. J.A. regressed when she talked about Mother, and although she loved Mother, she wanted to stay with the paternal grandmother. She was fearful of Greg M. After two months with the paternal grandmother, her behavior improved. G.A. was "parentified . . . to an extreme" due to being raised in an environment with no boundaries. Her therapist believed that if she were returned to the unstructured environment she had been living in, she could develop problems such as a

11

reactive attachment disorder, borderline personality disorder, and problems with impulsivity.

At a hearing on October 23, 2013, the court granted the section 388 petition, terminated the maternal grandmother's guardianship, removed the girls from her care, and set a .26 hearing. It authorized Mother and the maternal grandmother to have weekly four-hour visits. It denied Mother's request for a bonding study without prejudice. Mother renewed the request in December, and it was again denied.

*.26 Hearing*

The .26 hearing took place in February 2014, and the parties waived cross-examination of the social worker. In reports submitted for the hearing, SSA recommended terminating parental rights and freeing the children for adoption. The children were healthy, content, and comfortable living with the paternal grandparents. The paternal grandparents met all the girls' needs and they wanted to adopt them.

SSA reported that G.A.'s therapist diagnosed her with oppositional defiant disorder (ODD). Although G.A. said her fantasy was to live with Mother, she voiced past experiences that negatively impacted her living in a dirty home, abuse in Mother's home, yelling, a sense of moving around from home to home, and Mother's various boyfriends. G.A.'s therapist believed G.A. would benefit from remaining with the paternal grandmother because return to Mother's care would make her regress to old dangerous behaviors due to lack of structure, boundaries, and stability. J.A.'s academic tutor reported J.A. had problems with focus, impulsivity, and proper social cues, but she was improving because of structure, routine, and positive reinforcement in the paternal grandparents' home. J.A.'s therapist reported J.A. was diagnosed with ADHD and ODD and was prescribed psychotropic medications. She was adjusting to her change of environment but had internalized negative thoughts, low self-esteem, and self-sabotaging behaviors.

12

The social worker explained the girls sought the paternal grandparents' attention and expressed they felt safe with them. The paternal grandparents continued to want to adopt both girls. The girls had both lived with the paternal grandparents from November 2010 to May 2011, and since May 2013.

Mother and the maternal grandmother were permitted monitored weekly visits. Out of 20 visits between October 5, 2013, and February 10, 2014, Mother did not attend seven. Some visits went well and some did not. The monitor had concerns about Mother's and the maternal grandmother's behavior during some visits. Although sometimes affection and shared pleasurable experiences and appropriate redirection occurred during the visits, sometimes the girls had difficulty listening to Mother, became disruptive, and acted out. When the children did not listen to redirection, there were no consequences from Mother. Sometimes the girls wanted to leave visits, sometimes they did not want Mother to leave, and sometimes J.A. would display negative behavior after visits.

Brother testified he had lived with G.A. and J.A. most of their lives. Based on what Mother and maternal grandmother told him, he believed the paternal grandparents were unsuitable caretakers.

Seven-year-old G.A. testified she was happy living with the paternal grandparents. They treated her and J.A. equally. She called them "Grandma" and "Grandpa," and called Mother "Mom." When asked to name the five most important people in her family, she replied, "my two dogs . . . , my [paternal grandparents], my mom and my brother." She denied telling her therapist she wanted to live with Mother, and could not describe any good memories she had of her. But she testified she loved her mother and would be sad if she never saw her again. The only person she identified who she missed a lot was the maternal uncle.

Six-year-old J.A. testified she called the paternal grandparents "Grandma" and "Grandpa." She liked everything about living with them but thought she was treated

13

better than G.A., who got in trouble more. When asked to identify who in her family did not live with her, she named the maternal grandmother, Brother, and the maternal uncle "and that's all." But she considered Mother part of her family, identified her as one of the important people in her life, and missed her. She had good memories of playing with Mother and liked their visits. She would be sad if she could not see Mother anymore, and cry, but "only for one day." The family members whom she loved were: "Mommy and Daddy and [the paternal grandparents] and G.A. I love all my family."

The visitation monitor who monitored the maternal family's visits for about four and a half months before the .26 hearing testified. There were almost 20 visits, with both Mother and the maternal grandmother. She testified Mother missed three visits during this time. The visits were generally positive. G.A. was affectionate with Mother and other maternal family members, and would prolong goodbyes, clinging to Mother. J.A. was less affectionate, and took a while to warm up. Mother was always appropriate. The girls did not act differently when Mother was not at a visit.

The maternal grandmother testified the girls and Mother were "bonded deeply." At visits, G.A. was always hugging Mother, telling Mother she loved her, and did not want to leave when visits ended. J.A. "beam[ed]" when Mother praised her, and sometimes, but not often, expressed she missed Mother when Mother was not at a visit.

Mother testified that since May 2013, either she or children had missed six or fewer of their weekly visits. Mother agreed she missed two out of four visits in the past month. G.A. was always excited to see Mother at the beginning of each visit; J.A. took longer to warm up to her. The girls always said they loved Mother, and once or twice a month G.A. would say she missed Mother and prolonged her goodbyes. Mother comforted the girls, and she did not want them to be adopted.

At the conclusion of the .26 hearing, the court found the children were adoptable and terminated parental rights. The court found Mother did not satisfy either prong of the parental benefit exception. With regard to the regular visitation prong, the

14

court noted that over the entirety of the case, Mother had not maintained regular and consistent visitation. She would get "frustrated or upset with the state of affairs, whatever they were, and she would choose not to visit these children out of a fit of pique or frustration . . . ." On numerous occasions Mother "chose not to visit these children because she was angry with the system[,]" but visitation was for the children's benefit, not Mother's and not the system's. As to the beneficial relationship prong, the court observed Mother was not in a truly parental relationship with the girls, if anything it was the maternal grandmother who parented them. Mother was more like "the irresponsible older sister [who] is attempting to exert . . . sibling control over the children . . . ."

DISCUSSION

Mother contends the juvenile court erred by failing to apply the parental benefit exception to termination of parental rights. We find no error.

At a permanency hearing, the court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Adoption is the permanent plan preferred by the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573-574 (*Autumn H.*).) An exception to the adoption preference occurs when termination of parental rights would be detrimental to the child because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent bears the burden of proof on both these prongs: (1) that visitation was consistent and regular; and (2) that the child would benefit from continuing the relationship. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1253.)

We apply the substantial evidence standard of review to factual issues, such as consistency of visitation and the existence of a beneficial parental relationship, and the abuse of discretion standard to the discretionary determination of whether there is a compelling reason for finding termination would be detrimental to the child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530-531 (*J.C.*); *In re Bailey J.* (2010) 189 Cal.App.4th

15

1308, 1314-1315; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) The analysis under either standard of review is essentially the same under both standards because "'[e]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order . . . .'" [Citations.]" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

The regular visitation and contact element of the beneficial relationship exception "is somewhat self-explanatory." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2014) Permanency Planning Procedures, § 2.171[5][b][i][A], p. 2–542.) It does not require the parent to have "'maintained day-to-day contact'" (*In re C.B.* (2010) 190 Cal.App.4th 102, 124), but it does require the parent to have "maintained *regular* visitation and contact" (§ 366.26, subd. (c)(1)(B)(i), italics added).

Substantial evidence supports the court's finding Mother's visitation was not regular and consistent. During this four-year dependency proceeding, Mother's visitation with her daughters ranged from four to 10 hours per week, almost all of which was monitored. There were times she visited consistently. But there were also periods when her visitation became erratic often because, as the court noted, Mother was angry with the dependency system. In the summer of 2011, she had several months of not visiting the girls, after her visitation was restricted to professionally supervised due to her violating visitation conditions. In the fall of 2011, she complained about being unable to find time to go to the visitation center and she "[could not] stick to something consistent" because of her schedule. When the court again imposed a professional monitor in August 2012, Mother again was not willing or able to accept the terms of the supervised visitation. Again, she missed visits, refused to commit to a visitation schedule, cancelled visits because of work, did not show up, or left early when she became frustrated with the children. During the reporting period from around October 2013 until the .26 hearing,

16

reports ranged from Mother missing three to seven of 20 visits.  Mother conceded she missed two out of the four scheduled visits right before the .26 hearing.  The court could reasonably conclude Mother's visitation was not regular and consistent and she was not making a priority the goal of maintaining stable relationships with her daughters. (See *J.C., supra,* 226 Cal.App.4th at pp. 531-532.)  Because the record supports the trial court's finding Mother did not maintain regular and consistent visitation, we do not address the second prong of the parental benefit exception, which requires the court to balance the strength and quality of the natural parent/child relationship against the security and the sense of belonging provided by an adoptive family.  (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

DISPOSITION

The order is affirmed.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


ARONSON, J.

17